1
2
3
4
5
6
7
8
9
10

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VINCENT HARPER-BEY,<br><br>                          Petitioner,<br><br>        vs.<br><br>TIM VIRGA, Warden,<br><br>                          Respondent. | Civil No.        12cv364-BTM (PCL)<br><br>**REPORT AND RECOMMENDATION RE: PETITION FOR WRIT OF HABEAS CORPUS** |

## I.      INTRODUCTION

Petitioner Vincent Harper-Bey, a prisoner proceeding *pro se*, filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254, challenging his conviction in San Diego County Superior Court case number SCD205612 on eight counts of second-degree robbery and enhancements for a serious prior felony and a prior strike conviction. (Lodgment 1, at 291-307.) Petitioner was sentenced to serve 27 years in state prison. (Id. at 243.) Petitioner alleged eight claims in this petition: (1) violation of his due process rights at arraignment when the court failed to accept his guilty plea; (2) violation of his due process rights regarding how he was arraigned and charged; (3) ineffective assistance of counsel at his arraignment; (4) ineffective assistance of appellate counsel; (5) violations of his Sixth and Fourteenth Amendment rights when the trial judge denied a motion to replace himself with another trial judge; (6) violations of his Sixth and Fourteenth

Amendment rights when the court failed to compel attendance of certain witnesses; (7) the trial court exceeded its jurisdictional limits by enhancing his punishment using a strike prior and prison prior from another jurisdiction; and (8) the trial court erred in its rulings on his <u>Marsden</u> hearing and in denying his request for a second <u>Marsden</u> hearing. (Doc. 1, at 19-76.) For reasons set forth below, this Court respectfully recommends the Petition be **<u>DENIED</u>**.

## II.  FACTUAL BACKGROUND

This Court gives deference to state court findings of fact and presumes them to be correct; Petitioner may rebut the presumption of correctness, but only by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); <u>see</u> <u>also</u> <u>Sumner v. Mata</u>, 449 U.S. 539, 550 (1981).  The following facts are taken verbatim from the California Court of Appeal's opinion:

### A. The People's Case

1. *Counts 1 and 2: Union Bank (Aug. 23, 2006)*

On August 23, 2006, Kristie Gist and Megan Wiebke were working at a Union Bank in Lemon Grove.  At about 4:00 p.m., Harper walked up to Wiebke's teller window, pulled out of his pants a large gun with a silencer on the end, pointed the gun at Wiebke, and told her to hand over her "large." Wiebke, who was frightened, handed over all the large bills she had, a total of $8,000.

Harper then looked over at Gist, who was Wiebke's manager, and motioned for her to come.  When she came to the teller window, Gist noticed that Harper, who was saying "[l]arge only, large only," had a gun in his jumpsuit. Gist gave Harper about $1,500.

2. *Count 3: Wells Fargo Bank (Oct. 10, 2006)*

On October 10, 2006, at around 4:00 p.m., Adam Foster was working at the Wells Fargo Bank at Fourth and "B" Street in San Diego, when Harper walked up to his merchant's teller window without being called, and said, "I need to make a cash withdrawal, do not panic, do not want to have to kill you." Harper lifted up his shirt and showed Foster a gun that he had tucked into his pants. Harper asked for $100 bills, and Foster gave him some.  Foster gave Harper a total of about $7,800.

3. *Count 4: Washington Mutual Bank (Nov. 28, 2006)*

In November 2006 Karla Santiesteban was working at the Washington Mutual Bank on Mission Bay Drive in San Diego.  At about 10:30 a.m., Harper walked up to her teller window, lifted up his shirt, showed her a gun tucked in his pants, and demanded money in $100 and $50 bills.  Harper moved closer to Santiesteban, who was frightened, and pulled the gun out a little.

Santiesteban did not have many $100 and $50 bills, so she grabbed 10's, fives, and ones to make what she gave him look bulky.  Harper told her not to give him a dye pack, but she did anyway. Harper, however, found the dye pack, ripped it open, and asked for more 100's and 50's.  Santiesteban told him she did not have any more because most of the cash was stored in cash dispensers.  Harper told her to open the dispenser and take out the money.  Santiesteban told him she could not do that, but that she could type a

code in the computer, and it would dispense cash.  Harper told her to do that, but, when nothing came out, he left.  Santiesteban gave Harper a total of about $1,200.

4. *Count 5: Wells Fargo Bank (Dec. 20, 2006)*

On December 20, 2006, at around 5:00 p.m., Eric Wade was working at the Wells Fargo Bank on Rosecrans Street in San Diego when Harper came in and walked up to Wade's teller line as he was closing.  Harper nodded at Wade and lifted up his jacket to show he had a gun. Harper pulled the gun out of his pants and placed it on the counter so it was pointed at Wade. Harper asked for "large hundreds," but Wade gave him 20's, 10's and fives in the total amount of about $200.

5. *Count 6: Union Bank (Feb. 8)*

On February 8, just before noon, Marlene Caro was working at the Union Bank on University Avenue in San Diego when Harper came in wearing a Rastafarian hat with fake dreadlocks.  He walked to Caro's teller window and started talking about how he needed money for payroll. Harper placed a gun on the counter so it was pointed at her and told her she had one minute to give him all the money.  When Caro started grabbing 20's, he told her he did not want them, so she started grabbing the $100 and $50 bills. Caro feared she was going to die. After he took the money, Harper nonchalantly walked out the side door of the bank.

6. *Count 7: Washington Mutual Bank (March 24)*

On March 24 Ashley Peltier was working at the Washington Mutual Bank at 1740 Rosecrans Street in San Diego. At around 11:15 or 11:30 a.m., Harper walked up to her, lifted his shirt, and put his hand on the handle of a gun in his belt.  Peltier gasped because she was frightened. Harper said, "Shh," and motioned with his finger for her to be quiet. He then said, "50's and 100's."

When Peltier reached in her top drawer to press the emergency button, Harper said, "uh-huh." Peltier then handed him $1,250 in 100's and 50's. Harper thanked her and walked out.

7. *Count 8: Wells Fargo Bank (March 27)*

On March 27, just before noon, Jennifer Shutrump was working at the Wells Fargo Bank in Fashion Valley in San Diego when Harper came up to her teller window wearing a multicolored hat with fake dreadlocks. He pulled up his shirt, pulled out a gun with what looked like a silencer on the end of the barrel, placed it on the counter pointed in Shutrump's "general direction," and asked for 100's and 50's. Shutrump triggered the silent alarm, then reached into her drawer, and pulled out a stack of cash in the amount of about $2,200, and gave it to Harper.

San Diego Police Detective Thomas Levenberg responded to the scene and determined from witnesses the direction the robber ran after leaving the bank. Detective Levenberg thereafter viewed some videos taken by surveillance camera in the parking lot of an AM/PM minimart, which is located a few hundred feet away in the direction of the robber's travel. The video showed a Black male with the same clothing, hat and dreadlock wig as the robber getting out of a silver, late 1990's or early 2000's Nissan Altima parked at the AM/PM minimart before the robbery and getting back in the passenger side of the car after the robbery.

Detective Levenberg and other police officers determined that Harper had been stopped in October 2006 driving a 1987 Nissan Altima bearing license plate No, 4CQX624. The registered owner of the car was Coterica Richardson. Officer Levenberg and other

police officers conducted surveillance of her residence and observed Harper coming to and going from the residence and getting into the Nissan Altima.

Harper was arrested on March 31. Harper did not cooperate with the booking process and made faces so as to make it difficult to get a straight picture of his face. Harper refused to have his mouth swabbed for DNA evidence, so the police had to draw blood.

**B. *The Defense***

Harper did not testify in his own defense. Coterica Richardson testified that she dated Harper from February 2006 until the following March, when he was arrested. During the time they lived together, Richardson never saw any fake dreadlocks or weapons, and she did not see Harper wear any of the clothing worn by the robber shown in the surveillance camera photographs. She did not see him with large sums of money from the end of August 2006 to the following March.

Richardson also testified that in May 2006, she met Ali Abdula, who was a boyfriend of her friend Shantille Cherry. On February 8, 2007, Abdula borrowed Richardson's late-1990's Nissan Altima. Harper, not Richardson, gave Abdula permission to borrow the car that day. Abdula borrowed the car on several other occasions.

On March 24 Richardson took Cherry to the store in her car. Harper's clothes were in the car. Abdula gave Harper money for a missing hat.

On cross-examination, Richardson stated she kicked Harper out of her house two weeks before he was arrested, but some of his clothes remained in her house, and she had still loaned him her car. A couple of times a week he took her to work and then had the car all day.

Jeremiah Brown testified that on February 8 he was sitting behind the Union Bank on University Avenue in San Diego. A police officer drove by and asked him whether he had seen a man wearing a Rastafarian beanie come by. Brown told the police he did see the man walk by with another African-American man. He had seen them pull up in a rusty teal green car. The man with the beanie was driving. The driver got out of the car and went around the left side of the bank building. About five or 10 minutes later, he came back to the car in a hurry, and he and his passenger drove off. Brown heard the car tires squeal. On cross-examination, Brown stated the car had been parked within an arm's reach of Brown.

On October 10, 2006, following the robbery of the Wells Fargo Bank at Fourth and "B" Street on that same day, Officer Darryl Willis detained Harper as a suspect in downtown San Diego. Officer Matthew Johnson brought a witness, a Mr. Foster, in a police car from the scene of the robbery to a curbside lineup to look at Harper. Foster did not make a positive identification of Harper as the robber.

Andrea Cunha testified that on March 24, in the evening, she was walking home in the vicinity of the Washington Mutual Bank on Rosecrans Street. Her friend Dorothy Zapien had told her the bank had been robbed. Cunha saw a Black male wearing pancake makeup. The man, who was about 40 years of age and six feet tall, was wearing gold glasses and a golf hat. Later in the evening, Cunha's daughter and son found a hat in a brown paper bag on the corner in some bushes. A couple of days later, Cunha gave the hat to someone at the bank. Cunha stated she believed the man with makeup put the hat in the bushes. She also indicated that Harper was the man with the makeup and stated he was probably looking for his hat when she saw him.

In November 2006 Harper's probation officer, James Whelpley, checked the surveillance photographs of the robbery of the Washington Mutual Bank on Mission

Bay Drive. Whelpley testified that although there were similarities between Harper and the person shown robbing the bank, there were also differences.

Thomas MacSpeiden, a clinical psychologist, testified regarding factors that influence eyewitness identification.

Steven Hillard testified that the residence he shared with Harper was searched by the police on March 31. The bulletproof vest confiscated from the bedroom belonged to one of Hillard's friends.

(Lodgment 8, at 1-8.)

## III.   PROCEDURAL BACKGROUND

On April 4, 2007, Petitioner was arraigned on a complaint charging six counts of second-degree robbery in violation of California Penal Code section 211. (Lodgment 3, at 1-2.) On April 17, 2007, Petitioner was arraigned on an amended complaint with two additional counts of second-degree robbery, for a total of eight counts. (Lodgment 1, at 1-8.) The complaint also included enhancements for a strike prior and a serious felony prior arising from a 1997 bank robbery conviction in federal court. (Id.)

At the arraignment, Petitioner told his public defender, Mr. Rodriguez, that he wished to plead guilty. (Lodgment 4, at 1.) Mr. Rodriguez advised Petitioner to take a not guilty plea. (Id.) Mr. Rodriguez informed the court that Petitioner wished to enter a guilty plea, but offered to enter a not guilty plea on Petitioner's behalf and over Petitioner's objections. (Id.) The court responded, "I'm not going to accept a guilty plea before he's talked to an attorney; that's not my function in this court, so I'm not going to do it." (Id.) The court then accepted the not guilty plea submitted by counsel on behalf of Petitioner, over Petitioner's objections. (Id.)

The following procedural facts, which describe Petitioner's issue with his court-appointed attorney at the trial court level and his subsequent self-representation, are taken from the Court of Appeals opinion:

### A.  *June 26* **Marsden** *Hearing*

On June 26 Judge Danielson held a hearing on Harper's Marsden motion for appointment of new trial counsel. The court excused the prosecutor and asked Harper what "the problem" was with the representation his current counsel, Epley, was providing. Harper replied that he liked Epley and thought he was a "competent lawyer." However, Harper complained that it seemed Epley lacked confidence he could prevail in the case. Judge Danielson responded:

"Well, let me make sure that I understand what you are telling me. [Epley] is not confident

because he has independently evaluated the strength of the People's case and has come to the conclusion that the only intelligent conclusion is ... that you are going to lose most of these counts if not all of these counts?"

Harper replied, "It's a possibility, yes, Your Honor." Harper then indicated he believed evidence existed that would raise a reasonable doubt about his guilt. Specifically, he claimed that four or five of the bank witnesses who were 100 percent sure of their identification of him had either failed to identify him during the initial photographic lineups or had identified someone else as the perpetrator. He also indicated that he had new information, which he had not yet shared with Epley, that a security guard at the Washington Mutual Bank on Rosecrans Street saw a man exit the door of the bank and get into a black SUV; and he also had information that another potential witness, whose name he did not know, had seen that man.

Harper also complained that he had confided in Epley that if he received a substantial prison sentence in this matter, he probably would not "make it through that sentence" because of unspecified "health issues"; Harper was bothered by the fact that before the preliminary hearing his girlfriend told him that Epley had asked her, in the presence of one of her friends, whether Harper had cancer or AIDS and why he would not release his medical records.

The court asked Epley whether he was aware of the medical issues to which Harper referred, and Epley replied: "Harper initially told me that there was a medical condition that he had which would make any sentence he had a light sentence, and he didn't want to elaborate or give me any more information, nor would he sign a confidential medical records release so I could get medical records." Epley told the court that in talking with Harper's girlfriend before the preliminary hearing, he asked whether Harper was sick and whether she knew if he was getting treatments. Epley said he did not know what, if anything, was wrong with Harper, and he may have asked his girlfriend whether he had cancer or AIDS.

The court then asked Epley, "[I]n terms of your confidence, is there a problem with being prepared to go to trial[?]" Epley responded that there was no such problem, he had told Harper he could adequately represent him, and he would do so "to the best of [his] ability." He acknowledged he told Harper that the prosecution had "strong evidence for a conviction" if "it comes out the way it did at the preliminary hearing," unless they had "something else to counter that." However, he also told Harper that he had tried 131 cases and, although Harper could be convicted if he went to trial, Epley had been "surprised before in both ways," and "you never know what a jury is going to do." Epley indicated he was aware that "there [were] some issues initially" with respect to witnesses "not being able to pick somebody out of a lineup," and he saw that their "confidence level was quite high" at the second lineup. Epley also indicated he understood that the earlier identifications could be used for impeachment, and he planned to do so as he had done during the preliminary hearing.

Harper volunteered that, "I really don't have a problem with Mr. Epley," but then complained again that Epley was not confident Harper could "win" the case. The court then asked Harper:

"Would you rather have a very, very competent clueless lawyer or a competent lawyer that had a clue about what was going on?"

Harper responded: "A competent lawyer with a clue." Replying, "Then why do you want me to appoint somebody else for you?", the court denied Harper's Marsden motion, explaining that "[t]his is a non-meritorious Marsden motion, and there is no basis to replace counsel."

6

Thereafter, the trial call was set for September 17.

**B. *September 12 Hearings***

*1. Proceedings before Judge Fraser*

On Wednesday, September 12, Harper, who had filled out a *Lopez* waiver (footnote omitted) form but was still represented by Epley, appeared before Judge Fraser to request that he represent himself because he and Epley had "a disagreement" as to how his case should be presented. When the court advised Harper that Epley was "a very good lawyer" and indicated to Harper that it would be better to keep Epley as his lawyer rather than try to represent himself, Harper responded:

"Me and Mr. Epley don't agree on how I can present my case. The problem with this was Mr. Epley hadn't even researched, he hadn't even interviewed witnesses or anything. I submitted a motion, a letter, to Mr. Epley asking–"

The court interjected:

"We had already done the Marsden. We don't need to go into that. That was denied. The law requires that I talk to you about representing yourself because everybody recognizes it is not a very good idea."

After Harper indicated that he understood, the court asked him whether he was ready to begin the trial on Monday (September 17). Harper responded he would not be ready because "[t]here is additional discovery that I need and interviews of the witnesses that need to be done, which I discussed with [Epley], that hasn't been done yet." When the court again asked Harper whether he wanted to represent himself, Harper replied, "I wanted another lawyer but since that can't happen, I'll represent myself."

The court then relieved Epley and granted Harper's request to represent himself. The court appointed a runner and investigator to assist Harper, assigned the case to Judge Bashant for all purposes, and ordered Harper and the prosecutor to report to her forthwith.

*2. Proceedings before Judge Bashant*

Soon thereafter, also on September 12, Harper in propria persona and the prosecutor appeared before Judge Bashant. Harper requested a continuance of the trial date on the ground material witnesses had not been interviewed. Specifically, he identified James Whelpley, Shantille Cherry, and Cassandra Luccio. Whelpley was Harper's probation officer who, according to Harper, believed that Harper was not the person shown in a surveillance photograph of the robber at the Washington Mutual Bank on Mission Bay Drive. Harper represented that Cherry would testify that her boyfriend, "Ali," "[e]ssentially set me up in these bank robberies." He also represented that Luccio would testify that she worked at the Wells Fargo Bank in Fashion Valley, she knew Harper because she opened an account for him at that branch, she could give her opinion about whether it was likely Harper would rob a bank at which he had an account, she might have been present on the day that bank was robbed, and thus she might be able to testify that he was not in any "surveillance footage." The court found that the witnesses were not material and denied Harper's request for a continuance of the trial on that basis.

Indicating that the prosecutor would be introducing "some DNA evidence," Harper stated he "needed to obtain a DNA fingerprint expert witness and a photo identification expert witness." When the court asked the prosecutor whether he was going to present DNA testimony, the prosecutor responded that he doubted he would present such evidence, he

wanted to review some lab reports over the weekend, and "whatever discovery is available has been available to [Harper and Epley] for at least six weeks." Harper stated he did not have all of the discovery evidence and complained that it would be "highly unfair" to be "forced to go to trial in five days." The court denied Harper's request to continue the trial date.

*C. Continuances of the Trial Date*

On September 17, the date set for trial, Judge Bashant addressed a handwritten motion for continuance filed by Harper and noted that Judge Fraser had denied Harper's *Marsden* motion. The court expressed concern about Harper's statement that he had not had access to the law library and had not been given a runner and a private investigator as ordered by Judge Fraser. The prosecutor opposed Harper's request for a continuance, indicating he believed Harper's decision to represent himself was "done exclusively for the purpose of delay."

Judge Bashant trailed the matter to the next day, September 18, on which date she trailed the trial again to Monday, September 24. Harper immediately complained that he did not have adequate time to prepare for a trial. The court reminded Harper that he was told when he asked to represent himself that he still had to be "ready to go" on the date set for trial. The court explained to Harper that he had two choices: "You can either go to trial representing yourself . . . or you can go to trial with [Epley] representing you. I will appoint [Epley today] if you didn't understand that you had to go to trial on Monday." Harper replied that he would continue to represent himself, but complained again that he was "not ready."

On Monday, September 24, the court trailed the jury trial to October 1 and set the case for a pretrial status conference on September 28.

At the September 28 hearing, Harper addressed numerous problems he was having in preparing his defense for trial.

On October 1, the prosecutor withdrew his opposition to a continuance of the trial in light of his decision to present expert testimony concerning DNA evidence. The court continued the trial to October 29 and on that date continued it again to December 3.

On December 3, Harper complained about his inability to locate and interview witnesses. Judge Bashant denied his request for a continuance and trailed the trial to the following day.

On December 4, Harper told the court he was requesting an attorney because he was "not allowed to put on a defense." Judge Bashant offered to appoint counsel to represent Harper, but admonished that "I am not going to play any more games with this." Harper withdrew his request for a lawyer. Jury selection commenced during the afternoon session, and the first witness testified on December 5.

(Lodgment 8, at 8-15.)

The jury convicted Petitioner on all eight counts of robbery, and found true the allegations of a prior serious felony conviction and a prior strike conviction. (Lodgment 1, at 289-299.) On May 6, 2008, the trial court sentenced him to 27 years in prison. (Id.) The appellate court affirmed Petitioner's conviction on December 17, 2009, addressing Petitioner's Marsden violations claims. (Lodgment 8, at 2.) Petitioner then filed a petition for review in the California Supreme Court,

which was denied on March 10, 2010. (Lodgments 9, 10.)

On April 19, 2012, Petitioner filed a petition for writ of habeas corpus in the San Diego Superior Court. (Lodgment 11.) In his petition, Petitioner raised five claims: (1) due process violations at arraignment resulting from ineffective assistance of counsel, the trial court's failure to accept his guilty plea, and the trial court's errors relating to exceeding proper jurisdiction; (2) ineffective assistance of appellate counsel; (3) violations of Sixth and Fourteenth Amendment rights when the trial court denied his motion to disqualify the judge; (4) violations of Sixth and Fourteenth Amendment rights of compulsory process to compel the attendance of witnesses; and (5) the constitutional limits of the state's extraterritorial jurisdiction were exceeded when priors were used to enhance his sentence. (Id. at 3-7.) On November 8, 2010, the superior court denied the petition. (Lodgment 12, at 2.)

On January 5, 2011, Petitioner filed an appeal in the state appellate court. (Lodgment 13.) The state appellate court denied the petition, affirmed the superior court's judgment and adopted the superior court's findings. (Lodgment 14.) On April 18, 2010, Petitioner filed a petition for writ of habeas corpus with the California Supreme Court, which was denied on September 28, 2011. (Lodgments 15, 16.) On February 9, 2012, Petitioner filed a petition for writ of habeas corpus in this Court. (Doc. 1.) Respondent filed an Answer, (Doc. 17), and Petitioner filed a traverse (Doc. 19).

## IV.    DISCUSSION

A.    **Standard of Review**

    1.    **Legal Standards For Federal Habeas Relief**

A federal court "shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Federal habeas courts may not "reexamine state-court determinations on state-law questions." Estelle v. McGuire, 502 U.S. 62, 68 (1991). "[A] state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas

corpus." <u>Bradshaw v. Richey</u>, 546 U.S. 74, 76, (2005); <u>see</u> <u>Park v. California</u>, 202 F.3d 1146, 1149-50 (9th Cir. 2000) ("a violation of state law standing alone is not cognizable in federal court on habeas").

The Antiterrorism and Effective Death Penalty Act ("AEDPA") governs review of Petitioner's claims because he filed his federal habeas petition after that statute's 1996 effective date. <u>Lindh v. Murphy</u>, 521 U.S. 320, 322-23 (1997). AEDPA imposes a "'highly deferential standard for evaluating state-court rulings,'" requiring "that state-court decisions be given the benefit of the doubt." <u>Woodford v. Visciotti</u>, 537 U.S. 19, 24 (2002), quoting <u>Lindh</u>, 521 U.S. at 333 n.7. Habeas corpus is a "'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." <u>Harrington v. Richter</u>, 562 U.S. __, 131 S.Ct. 770, 786 (2011), quoting <u>Jackson v. Virginia</u>, 443 U.S. 307, 332 n.5 (1979) (Stevens, J., concurring). "As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." <u>Id.</u> at 786-87.

"AEDPA prevents defendants -- and federal courts -- from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts." <u>Renico v. Lett</u>, 559 U.S. 766, 130 S.Ct. 1855, 1866 (2010). "By its terms § 2254(d) bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions in §§ 2254(d)(1) and (d)(2)." <u>Richter</u>, 131 S.Ct. at 784. Habeas relief is available under the first exception if the state court result "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); <u>see</u> <u>Lockyer v. Andrade</u>, 538 U.S. 63, 73-76 (2003); <u>see also</u> <u>Williams v. Taylor</u>, 529 U.S. 362, 405-06 (2000) (distinguishing the 28 U.S.C. § 2254(d)(1) "contrary to" test from its "unreasonable application" test). To be found an "unreasonable application" of the precedent, the state court decision must have been "more than incorrect or erroneous;" it "must have been 'objectively

unreasonable.'" <u>Wiggins v. Smith</u>, 539 U.S. 510, 520-21 (2003) (citations omitted). The lack of holdings from the Supreme Court on the issue presented precludes relief under 28 U.S.C. § 2254(d)(1). <u>Carey v. Musladin</u>, 549 U.S. 70, 77 (2006). "[W]hen a Supreme Court decision does not 'squarely address[]' the issue . . . it cannot be said, under AEDPA, there is 'clearly established' Supreme Court precedent addressing the issue," and the federal habeas court "must defer to the state court's decision." <u>Moses v. Payne</u>, 555 F.3d 742, 754 (9th Cir. 2009). "Circuit precedent may provide 'persuasive authority' for purposes of determining whether a state court decision is an 'unreasonable application' of Supreme Court precedent," but "only Supreme Court holdings are binding on state courts, and 'only those holdings need be reasonably applied.'" <u>Rodgers v. Marshall</u>, 678 F.3d 1149, 1155 (9th Cir. 2012) (citation omitted).

Under the second AEDPA exception, relief is available only if the state court based its result "on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). "Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceeding, § 2254(d)(2)." <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 340 (2003); <u>Schriro v. Landrigan</u>, 550 U.S. 465, 473 (2007) (The question "is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable -- a substantially higher threshold.").

## 2.   <u>Exhaustion And Procedural Default</u>

State prisoners must exhaust their federal constitutional claims using procedures and remedies available in the state courts before a federal court can grant habeas relief. 28 U.S.C. § 2254(b)(1)(A). The exhaustion requirement obliges the petitioner to "fairly present" the claim to the highest state court by describing in the state proceedings both the operative facts and the federal legal theory on which the claim is based, "to provide the state courts with a fair 'opportunity' to apply controlling legal principles to the facts bearing upon his constitutional claim." <u>Anderson v.</u>

1   Harless, 459 U.S. 4, 6 (1982), quoting Picard v. Connor, 404 U.S. 270, 276-77 (1971). "If Petitioner

2   properly argued his claims through 'one complete round of the State's established appellate review

3   process' during an earlier petition, . . . they are exhausted and can be considered in federal habeas

4   proceedings." Cooper v. Neven, 641 F.3d 322, 326-27 (9th Cir. 2011), quoting O'Sullivan v.

5   Boerckel, 526 U.S. 838, 845 (1999). Although federal habeas relief cannot be granted on claims a

6   petitioner failed to exhaust, a federal court may deny habeas relief on unexhausted claims that are

7   not tenable under federal law. 28 U.S.C. § 2254(b)(2); see Granberry v. Greer, 481 U.S. 129 (1987)

8   (a federal court may deny an unexhausted claim on the merits, but only "where it is perfectly clear

9   that the applicant does not raise even a colorable federal claim").

10  **B.     Analysis**

11        Petitioner's complaints arise in their entirety out of a misunderstanding of California

12  criminal procedure. The brunt of Petitioner's complaints rest on his false belief that had he been

13  permitted to plead guilty at arraignment, he would be entitled to a much lower sentence than the 27

14  years he was ordered to serve. This belief is predicated on the fact that after a "not guilty" plea was

15  entered over his objections, the People added additional charges, ultimately resulting in

16  compounded sentencing and enhancements. Had he been permitted to plead guilty, Petitioner

17  argues, the People would not have amended the complaint to include two additional charges. He

18  therefore asserts a host of criminal procedure and jurisdictional errors flowing from the compulsory

19  "not guilty" plea.  Petitioner further alleges ineffective assistance of appellate counsel for failing to

20  take up his procedural arguments on appeal.

21        Petitioner asserts eight grounds for habeas relief alleged as follows: (1) violation of due

22  process rights at arraignment when the court failed to accept his guilty plea; (2) violation of due

23  process rights regarding how he was arraigned and charged; (3) ineffective assistance of counsel at

24  his arraignment; (4) ineffective assistance of appellate counsel; (5) violations of Sixth and

25  Fourteenth Amendment rights when the trial court denied his motion to disqualify the judge; (6)

26  violations of Sixth and Fourteenth Amendment rights of compulsory process to compel the

27  attendance of witnesses; (7) the trial court exceeded its constitutional limits of its jurisdiction when

28

it used a strike prior and prison prior from another sovereign to enhance his punishment; and (8) the trial court erred in its rulings on his <u>Marsden</u> hearings and in denying his request for a second <u>Marsden</u> hearing. (Doc. 1, at 19-76.)

This Court is ultimately convinced that the California state courts complied with the procedural rules of the state and with federal law in convicting Petitioner and affirming the conviction on appeal. Each of Petitioner's asserted grounds for relief is addressed in turn and should be denied.

1.   <u>Claim One: Petitioner's statutory rights under California law were violated at arraignment.</u>

In Claim One, Petitioner argues that the state court violated his statutory rights under state law when the court refused to accept his guilty plea at his arraignment. (Doc. 19, at 8.) Petitioner then concludes that by refusing to accept the guilty plea, the trial court committed a constitutional Due Process violation, entitling him to habeas relief. (<u>Id</u>.)

This court need not decide whether the state court committed error before assessing whether Petitioner's allegations meet the requirements for relief under the AEDPA. <u>Lockyer v. Andrade</u>, 538 U.S. 63, 64 (2003). A federal habeas petition is not a vehicle for retrying errors of state law, unless such error results in holding a state prisoner "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); <u>Wilson v. Corcoran</u>, 131 S.Ct. 13, 16 (2010) (citing <u>Estelle v. McGuire</u>, 502 U.S. 62, 67-68 (1991)). Therefore, we are not concerned with Petitioner's asserted errors of state law unless the error is so egregious it demonstrates "'extreme malfunctions in the state criminal justice system.'" <u>Harrington v. Richter</u>, 131 S.Ct. 770, 786 (2011) (quoting <u>Jackson v. Virginia</u>, 443 U.S. 307, 332 n.5 (1979) (Stevens, J., concurring)). Here, we do not assess whether the state court erred by entering a plea of not-guilty on behalf of Petitioner because Petitioner fails to state a federal question, let alone cause for habeas relief under the AEDPA.

Petitioner references several Supreme Court cases to argue that he has an unqualified right to have his guilty plea accepted at arraignment. (Doc. 19, at 9-13.) However, Petitioner fails to recognize that the Due Process Clause provides only for fundamental elements of fairness at trial.

<u>Dowling v. United States</u>, 493 U.S. 342, 352-353 (1990). The Supreme Court has defined the "category of infractions that violate 'fundamental fairness' very narrowly." <u>Id.</u> at 352. Petitioner's argument that fundamental fairness requires entry of a guilty plea falls flat because "a criminal defendant does not have an absolute right under the Constitution to have his guilty plea accepted by the trial court." <u>North Carolina v. Alford</u>, 400 U.S. 25, 38 n.11 (1970); <u>see</u> <u>Lynch v. Overholder</u>, 369 U.S. 705, 719 (1962).

For good reason, there exists no vehicle for Petitioner to force his state law procedural complaint to fit the narrow scope of recognized Due Process violations established by the Supreme Court. Petitioner is not permitted to repackage a state court error as a federal claim simply by asserting a due process violation. <u>Poland v. Stewart</u>, 169 F.3d 573, 584 (9th Cir. 1999). This Court therefore recommends that this claim be **<u>DENIED</u>**.

2. <u>Claim Two: The Court exceeded its jurisdiction by entering a "not guilty" plea on Petitioner's behalf and by not requiring the People to request formal leave to amend their complaint.</u>

Petitioner's concerns in his Second Claim arise from a misunderstanding of California criminal procedure. Petitioner asserts that the trial court exceeded its jurisdiction by entering a "not guilty" plea on Petitioner's behalf, and without Petitioner's consent.[1] (Doc. 1, at 10-18; Doc. 19, at 13-16.)  He accuses his defense counsel of "effectively acting as a second prosecutor" by submitting the not guilty plea on his behalf. (Doc. 1, at 17.)[2] Petitioner contends the court's failure to enter a guilty plea was further compounded when the court accepted an amended complaint from the People, without requiring the People to formally request the leave of the court to amend the complaint. (Doc. 1, at 10-18; Doc. 19, at 13-16.) The amended complaint contained two additional robbery charges, and enhancements for a prior robbery conviction. (<u>Id.</u>; Lodgment 1, at 1-8.) The result of these procedural errors, Petitioner argues, is that he was "precluded from plea bargaining

---

[1] We considered Petitioner's allegations related to entry of a not guilty plea in our analysis of Claim One above. We need not consider that same issue again simply because Petitioner asserts the same complaint again under Claim Two.

[2] We consider Petitioner's complaints as to trial court defense counsel below under Claim Three, and do not consider it here under Claim Two.

pursuant to §1192.7(c)(19), and received Three Times [sic] the sentence he would have otherwise received." (Doc. 1, at 18.) Aside from Petitioner's conclusions being patently false, Petitioner fails to set forth a federal claim.

Contrary to Petitioner's beliefs, a guilty plea at arraignment does not prevent the People from amending the complaint. In fact, the California Penal Code expressly allows such amendments after a defendant enters a guilty plea. <u>See</u> Cal. Penal Code § 969.5. Further, although Petitioner believes he would have been able to plea bargain, plea bargaining is prohibited for bank robbery charges under California Penal Code § 1192.7, the very statute Petitioner references. <u>See</u> Cal. Penal Code § 1192.7(a)(2); 1192.7(c)(19)(which states that plea bargaining is prohibited for serious felony charges including robbery). Finally, there is no federal right of a defendant either to plea bargain or right to use a guilty plea to limit prosecutorial authority to charge additional crimes. As we explained above, federal habeas relief is not available for alleged violations of state law, and Petitioner fails to state a federal question. <u>Estelle v. McGuire</u>, 502 U.S. 62, 67-68 (1991). Accordingly, the Court recommends this claim be **<u>DENIED.</u>**

3.    <u>Claim Three: Petitioner received ineffective counsel at his arraignment.</u>

In Claim Three, Petitioner contends his counsel rendered ineffective assistance during arraignment by preventing Petitioner from entering a guilty plea. (Doc. 1, at 25.) Petitioner is again drawing on his erroneous belief that had he been permitted to plead guilty at arraignment, the People would have prevented from amending the complaint against Petitioner to include two more charges and enhancements. (<u>Id.</u>)

To prevail on a claim for ineffective assistance of counsel, Petitioner must show that: 1) counsel's performance fell below an objective standard of reasonableness, and 2) this deficient performance prejudiced his defense. <u>Strickland v. Washington</u>, 466 U.S. 668, 688-691 (1984). In order to demonstrate prejudice, a defendant must show that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Id.</u> at 694. "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, that course should be followed." <u>Id.</u> at 670. Failure to make the required showing of

either deficient performance or sufficient prejudice defeats the ineffectiveness claim. Id. at 700.

Here, Petitioner argues that "an early plea was strategically advisable, to bar prosecution for more serious uncharged offenses." (Doc. 1, at 38.) However, this is a fallacious line of thinking. As we have already explained under our Claim Two analysis above, a guilty plea would have done nothing to bar the People from amending the complaint. Further, under Strickland, "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Strickland v. Washington, 466 U.S. at 686. Petitioner has failed to show ineffective assistance because he was forced to plead not guilty at arraignment.

Petitioner made these same arguments in a habeas petition to the California Superior Court, which denied his petition for failing to demonstrate prejudice flowing from ineffective assistance of trial counsel. (Lodgment 12, at 3.). We find that the state court's decision denying Petitioner's claims for ineffective assistance of counsel is consistent with federal law. Accordingly, this Court recommends that Claim Three be **DENIED.**

4.      Claim Four: Petitioner received ineffective assistance of appellate counsel.

On appeal, Petitioner directed appellate counsel to raise seven issues he believed to be meritorious.[3] (Doc. 1-3, at 33-39) In response, appellate counsel Robert Boyce sent Petitioner a letter providing a detailed explanation as to why he declined to raise each issue suggested by Petitioner in his appellate brief. (Doc 1-3, at 39.) The sole issue submitted by Mr. Boyce on appeal alleged abuse of discretion by the trial court in failing to grant Petitioner a second Marsden[4] hearing. (Lodgment 5.) Petitioner now asserts ineffective assistance of appellate counsel for failing to raise Petitioner's suggested issues. (Doc. 1-1, at 32-37.)

The Strickland standard applies to challenges of ineffective assistance of appellate counsel in

---

[3] Specifically, Petitioner wished to allege the following as issues on appeal: 1) Due Process violations at arraignment, 2) erroneous admission of DNA evidence, 3) erroneous admission of prejudicial testimony at trial, 4) bias of the part of the trial court judge, 5) abuse of discretion at sentencing, 6) a Constitutional challenge to California Penal Code section 2085.5, and 7) impermissibly suggestive photo array identifications. (Doc. 1-3, 35.)

[4] People v. Marsden, 2 Cal.3d 118 (1970).

the same manner as claims of ineffective assistance of trial counsel. Smith v. Robbins, 528 U.S. 259, 285-289 (2000). Under Strickland, Petitioner is required to demonstrate that appellate counsel's unprofessional performance prejudiced the outcome of the appeal. Strickland, 466 U.S. at 688-691. Here, Petitioner's entire complaint with appellate counsel is simply that appellate counsel did not perform in the manner demanded by Petitioner. But, Petitioner has no constitutional right to compel appointed counsel to press even non-frivolous points. See Jones v. Barnes, 463 U.S. 745, 751 (1983); see also Smith, 528 U.S. at 288 (an appellate attorney need not, and should not, raise every non-frivolous claim). Rather, appellate counsel may select from non-frivolous claims in order to maximize the likelihood of success on appeal. Id.; see, e.g., Grey v. Greer, 800 F.2d 644, 646 (7th 1986) ("Generally, only when ignored issues are clearly stronger than those presented will the presumption of effective counsel be overcome.").

Aside from Petitioner's bare assertions of discontent with appellate counsel's choice of issues presented on appeal, Petitioner articulates no arguments as to how any issue, properly raised, would have resulted in a reversal. The San Diego Superior Court applied Strickland and reached the same conclusion. (Lodgment 12, at 6.) We find the state court's decision is consistent with federal law. See Shah v. United States, 878 F.2d 1156, 1162 (9th Cir.1989) ("'The failure to raise a meritless legal argument does not constitute ineffective assistance of counsel.'"(citation omitted)).

As Petitioner has failed to show that the state court's ruling resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, we recommend this claim be **DENIED**.

5. Claim Five: Petitioner's Sixth and Fourteenth Amendment rights to Due Process were violated when the trial judge denied Petitioner's right to disqualify the trial judge under state law.

In Claim Five, Petitioner argues that his motion to disqualify the trial court judge under California Civil Procedure section 170.6 was erroneously denied. (Doc. 1-1, at 53-60.) Petitioner concludes that the failure of the trial court judge to recuse herself constituted a violation of constitutional Due Process, warranting federal habeas relief. (Id.) We disagree.

As we have said in Petitioner's other claims, a federal habeas petition is not a vehicle for retrying errors of state law, unless such error results in holding a state prisoner "in violation of the

Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); <u>Wilson v. Corcoran</u>, 131 S.Ct. 13, 16 (2010) (citing <u>Estelle v. McGuire</u>, 502 U.S. 62, 67-68 (1991)). The Supreme Court has consistently held that "most questions concerning a judge's qualifications to hear a case are not constitutional ones, because the Due Process Clause of the Fourteenth Amendment establishes a constitutional floor, not a uniform standard." <u>Bracy v. Gramley</u>, 520 U.S. 899, 904 (1997). The "floor" established by the Due Process Clause is a right to a "'fair trial in a fair tribunal,' before a judge with no actual bias against the defendant or interest in the outcome of the case." <u>Bracy</u>, 520 U.S. at 905 (quoting <u>Withrow v. Larkin</u>, 421 U.S. 35, 46 (1975)). The Constitution requires recusal only where "'the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable.'" <u>Hurles v. Ryan</u>, 706 F.3d 1021, 1036 (9th Cir. 2013) (quoting <u>Withrow</u>, 421 U.S. at 47). The question on review is "whether the average judge in her position was likely to be neutral or whether there existed unconstitutional potential for bias." <u>Id.</u> at 1037. But Petitioner must also "overcome a presumption of honesty and integrity in those serving as adjudicators." <u>Withrow</u>, 421 U.S. at 47.

In the instant case, Petitioner was convicted of bank robbery in the United States District Court, Southern District of California in 1997. (Lodgment 1, at 3.) Prior to his 2007 trial on the eight robbery counts, Judge Bashant informed Petitioner, in the interest of full disclosure, that she was a prosecutor for the U.S. Attorney's Office in 1997 at the time Petitioner was convicted of the federal robbery offense. (Doc. 1-4, at 10.) Judge Bashant declared on the record that she was not involved in Petitioner's prosecution, did not recognize his name or background, and did not believe her ability to be impartial would be at all impaired. (<u>Id.</u>). Petitioner subsequently filed a motion to disqualify Judge Bashant, pursuant to California Code of Civil Procedure section 170.6. (Doc. 1-5, 4-7.) The motion stated only that he believed Judge Bashant was biased because of her work at the U.S. Attorney's Office and "prior knowledge of his case." (Doc. 1-5, at 4.) Judge Bashant denied the motion, and Petitioner was subsequently convicted and sentenced with Judge Bashant presiding. (Lodgment 1, at 288-299.) Petitioner raised the issue of judicial bias in a habeas petition to the state court. (Lodgment 11.) The state court rejected Petitioner's argument on the grounds that his motion

18

to disqualify Judge Bashant was procedurally deficient, and its decision was adopted by the California Court of Appeal. (Lodgment 11, 13.)

To resolve Petitioner's complaint, we ask whether an average judge in Judge Bashant's position was likely to be neutral or whether there existed an unconstitutional potential for bias. Hurles, 706 F.3d. at 1037. Risk of unfairness "cannot be defined with precision because circumstances and relationships must be considered." Id. (internal quotations and citation omitted). For example, the risk of actual bias was unconstitutional where the judge was also part of the accusatory process, In re Murcheson, 349 U.S. 133, 136-137 (1955), and where a judge became "so enmeshed in matters involving [a litigant] as to make it appropriate for another judge to sit," Johnson v. Mississippi, 403 U.S. 212, 215-216 (1971). No such circumstances exist here. Petitioner has made no demonstration that Judge Bashant was biased. Although Judge Bashant served as a prosecutor in the U.S. Attorney's office at the time of Petitioner's earlier federal conviction, she was not involved in prosecution of that case and did not recognize Petitioner's name or background. Because Petitioner's claim involves California Code of Civil Procedure section 170.6, and because Petitioner has failed to articulate a complaint against Judge Bashant that remotely enters the realm of examples of judicial bias described by the Supreme Court, we find that Petitioner fails to state a federal claim. See Swarthout v. Cooke, __ U.S. __, 131 S.Ct. 859, 863 (2011) (noting that the Supreme Court has "long recognized that a mere error of state law is not a denial of due process")(internal citations omitted). Accordingly, we recommend that Claim Five be **DENIED**.

6. Claim Six: Petitioner's right to compel attendance of witnesses was violated

In Claim Six, Petitioner argues his Sixth Amendment and Due Process rights were violated when the prosecution team and a Sheriff's deputy prevented him from using two witnesses to testify in his favor: Jennifer Tucker and Shantill Cherry. (Doc. 1-1, at 61, 66.)

Under federal law, prosecutorial misconduct warrants habeas relief only if the prosecutor's actions "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Darden v. Wainwright, 477 U.S. 168, 181 (1986) (citation omitted).The Ninth Circuit has recognized that the government's interference with a defendant's access to witnesses may

constitute misconduct. See United States v. Black, 767 F.2d 1334, 1337 (9th Cir.1985) ("Absent a fairly compelling justification, the government may not interfere with defense access to witnesses."). Even if government misconduct is established which rises to the level of a constitutional violation, however, a habeas petitioner must still show that the error was not harmless under the Brecht[5] standard. See Karis v. Calderon, 283 F.3d 1117, 1128 (9th Cir. 2002).

Here, Petitioner has failed to show that the state court was unreasonable in its application of existing federal law or facts to the law. The state court found that Petitioner failed to provide any evidence that the prosecution blocked testimony of favorable witnesses. (Lodgment 12, at 4.) Moreover, Petitioner's claim of misconduct is meritless because Petitioner cannot prove he was prejudiced by the alleged constitutional violation. Petitioner stated at the motion-in-limine hearing that he did not plan on calling Jennifer Tucker to the stand. (Lodgment 4, at 64.) As for Ms. Cherry, the trial judge excluded most of Ms. Cherry's testimony on inadmissible hearsay grounds (Id. at 57), limiting Ms. Cherry's testimony to the facts that she saw Petitioner's clothes in the back of the car and then they disappeared (Id. at 59), facts that Petitioner's witness, Coterica Richardson, testified to during Petitioner's case-in-chief. (Id. at 671.) As such, not having Ms. Cherry testify would not amount to a "substantial and injurious effect" on Petitioner's case. What's more, when Ms. Cherry failed to appear in court to testify on Petitioner's behalf, Petitioner declined an offer of an arrest warrant to force her to testify. (Lodgment 4, at 541-543.) Thus, the supposed errors alleged by Petitioner would have been harmless. Accordingly, this Court recommends that federal habeas relief on this ground be **DENIED**.

7. Claim Seven: Constitutional limits of California's extraterritorial jurisdiction were exceeded when Petitioner's prior federal conviction was used to enhance his punishment.

In Claim Seven, Petitioner argues that the constitutional limits of the state's extra-territorial jurisdiction were exceeded when the state used his prior federal conviction to enhance his punishment. (Doc. 1-1, at 19.) Further, he argues that his Sixth and Fourteenth Amendment rights

---

[5]The Supreme Court held habeas petitioners must show an error "'had substantial and injurious effect or influence in determining the jury's verdict.'" Brecht v. Abrahamson, 507 U.S. 619, 638 (1993) (citation omitted).

1   were violated because a jury did not find beyond a reasonable doubt that he had been convicted of

2   the prior bank robbery. (Id.)

3        The last reasoned decision was made by the San Diego Superior Court. That court found the

4   following:

5   > Extraterritorial jurisdiction allows all known previous convictions, whether obtained in
> this state or elsewhere, to be used to enhance the sentence of a current conviction.
6   > Whenever a previous conviction is charged, the trier of fact, if it finds the defendant
> guilty of the offense charged, must also find whether the defendant has suffered the
7   > prior conviction. People v. Taylor (2004) 118 Cal.App.4th 11.

8   > Here, the jury found true the allegation of Petitioner's serious felony prior of bank
> robbery. Therefore, the use of the serious felony prior to enhance Petitioner's sentence
9   > was constitutional.

10   (Lodgment 12, at 5.)

11        The superior court ruled that California state law allows out-of-state prior convictions to be

12   used to enhance the sentence of a current conviction. (Id.) As framed, that is a state law issue.

13   Petitioner also cites to Apprendi v. New Jersey, 530 U.S. 466 (2000)[6] to support his claim that he

14   has a right for a jury to determine his prior conviction beyond a reasonable doubt. (Doc. 19-1, at

15   33.) However, Apprendi does not apply to prior convictions. Id. at 490. "Under the current state of

16   the law, the Constitution does not require prior convictions that increase a statutory penalty to be

17   charged in the indictment and proved before a jury beyond a reasonable doubt." U.S. v. Tighe, 266

18   F.3d 1187, 1191 (9th Cir. 2001). Thus, the state court's ruling is consistent with federal law.

19   Petitioner has failed to show the state court's ruling is contrary to or resulted in an unreasonable

20   application of existing federal law. Accordingly, this Court recommends that federal habeas relief

21   on this ground be **DENIED**.

22   8. Claim Eight: Petitioner's rights were violated when the trial judge denied his *Marsden* motions to

23   replace counsel.

24        In Claim Eight, Petitioner alleges that his first Marsden hearing was inadequate and that the

25   trial judge erred by refusing to hold a second Marsden hearing and the state court erred by applying

26

27        [6]Apprendi held, in part, that "other than fact of prior conviction, any fact that increases penalty
for crime beyond prescribed statutory maximum must be submitted to jury and proved beyond
28   reasonable doubt." Apprendi, 530 U.S. at 490.

1   the harmless error standard. (Doc. 1-1, at 76.) Respondent argues that Petitioner's claim is

2   unexhausted and that, even so, it is perfectly clear that Petitioner's claim is not tenable under

3   federal law. (Doc. 17-1, at 30.)

4        As a preliminary matter, we address the exhaustion issue. Before a federal court may grant

5   habeas relief on a claim, a petitioner must exhaust all available state judicial remedies. 28 U.S.C.A.

6   § 2254(b)(1)(A); Rhines v. Weber, 544 U.S. 269, 273–74 (2005) (referring to total exhaustion

7   requirement of Rose v. Lundy, 455 U.S. 509, 522 (1982)). A claim is exhausted only when a

8   petitioner has fairly presented it to the state courts. Duncan v. Henry, 513 U.S. 364, 365 (1995)

9   (citing Picard v. Connor, 404 U.S. 270, 275 (1971)). Moreover, courts may deny an application for

10  habeas relief on the merits even if the petitioner has not yet exhausted his state judicial remedies. 28

11  U.S.C.A. § 2254(b)(2). But courts have no authority to grant relief on unexhausted claims.

12  U.S.C.A. § 2254(b)(1)(A). Here, Petitioner has not exhausted his state remedies because Petitioner

13  did not raise the Marsden issue as a federal issue in the state courts. Even so, this Court addresses

14  the merits of Petitioner's claim and finds that it is not tenable under federal law.

15       The denial of a Marsden[7] motion to substitute counsel can implicate a criminal defendant's

16  Sixth Amendment right to counsel and is properly considered in federal habeas corpus. Bland v.

17  California Dep't of Corrections, 20 F.3d 1469, 1475 (9th Cir.1994), cert. denied, 513 U.S. 947

18  (1994), overruled on other grounds by Schell v. Witek, 218 F.3d 1017 (9th Cir.2000) (en banc). The

19  relevant inquiry is whether the Petitioner's Sixth Amendment right to counsel was violated. Schell,

20  218 F.3d at 1026. The Sixth Amendment guarantees effective assistance of counsel, not a

21  "meaningful relationship" between an accused and his counsel. Morris v. Slappy, 461 U.S. 1, 14

22  (1983). When assessing a trial court's ruling on a Marsden motion in the context of a federal habeas

23  corpus proceeding, the Ninth Circuit has held that the Sixth Amendment requires only "an

24  appropriate inquiry into the grounds of such a motion, and that the matter be resolved on the merits

25

26       [7]The term "Marsden" comes from People v. Marsden, 2 Cal.3d 118 (Cal.1970), a California
    Supreme Court case which held, as part of a criminal defendant's right to effective assistance of counsel
27  under the Sixth Amendment, a trial judge must permit a defendant requesting substitute counsel the
    opportunity to present his reasons for the request, i.e. evidence and argument to establish that he is
28  receiving ineffective assistance of counsel.

1    before the case goes forward." <u>Schell</u>, 218 F.3d at 1025. Consideration of a number of factors is

2    appropriate, including the timeliness of the motion, the adequacy of the court's inquiry into

3    defendant's complaint, and whether conflict between the defendant and his counsel was so great that

4    it resulted in a total lack of communication preventing an adequate defense. <u>Hudson v. Rushen</u>, 686

5    F.2d 826, 829 (9th Cir.1982).

6         Here, the last reasoned opinion was provided by the state court of appeals, where the court

7    concluded the <u>Marsden</u> hearing was not inadequate. In finding that counsel was adequate, the state

8    court reasoned:

9         Here, the record shows the court gave Harper an adequate opportunity at the June 26 *Marsden*
          hearing to state the reasons for his *Marsden* motion. Judge Danielsen began by asking Harper

10        what "the problem" was with the representation his appointed counsel was providing. As already
          noted, Harper complained that it seemed to him Epley lacked confidence he could prevail in the

11        case, and stated that he (Harper) believed evidence existed that would raise a reasonable doubt
          about his guilt. The court permitted Harper to give several specific examples of such claimed

12        evidence.

13        The court also gave Harper an opportunity to complain that he had confided in Epley that
          if he received a substantial prison sentence in this matter, he probably would not "make

14        it through that sentence" because of unspecified "health issues." Harper indicated he was
          bothered by the fact that his girlfriend told him before the preliminary hearing that Epley

15        had asked her, in the presence of one of her friends, whether Harper had cancer or AIDS,
          and why he would not release his medical records.

16
          The court gave Epley an opportunity to reply and then gave Harper an opportunity to

17        respond. The foregoing record demonstrates the court's inquiry was adequate.

18   (Lodgment 8, at 15-18.)

19        Moreover, that court also addressed the severity of the conflict between Petitioner and Epley,

20   finding:

21        "Harper has also failed to demonstrate that an irreconcilable conflict had arisen in his
          relationship with Epley. Harper told the court he liked Epley, and he "really [did not] have a

22        problem with" him. With respect to Harper's complaint that Epley may have revealed
          confidential medical information to his girlfriend, Epley's response supported the court's

23        conclusion that Epley did not disclose any such information, but was merely attempting to gather
          information that might have assisted Harper during sentencing in the event he was convicted."

24   (<u>Id.</u>)

25

26        Lastly, the California Court of Appeal set forth a detailed summary of the evidence at the

27   hearing and affirmed the denial of the second <u>Marsden</u> motion:

28
                                                      23

Harper also contends the court erred in failing to hold a second pretrial *Marsden* hearing on September 12 or September 17. Harper's contention is unavailing.

As already discussed, Judge Fraser, who conducted the first of two hearings on September 12, told Harper that "[w]e have already done the *Marsden*," but relieved Epley as Harper's counsel and permitted Harper to represent himself. Judge Bashant, who conducted the second hearing on that date, allowed Harper to present an offer of proof with respect to potential defense witnesses Whelpley, Cherry and Luccio; denied his request for continuance; and trailed the trial to September 17. On that date, noting that Judge Fraser had heard and denied Harper's *Marsden* motion, Judge Bashant granted Harper's request for continuance. After a series of continuances, trial began on December 5.

We need not decide whether the court erred by refusing to hold a second pretrial *Marsden* hearing, as Harper contends, because any such error was harmless under any standard. The record shows that on December 4, before the commencement of trial and almost three months after the initial trial call and Harper's decision to execute a *Lopez* waiver and represent himself, Judge Bashant offered to appoint counsel to represent him. Harper, however, refused the offer, withdrew his request for appointment of new counsel, and elected to continue representing himself. Having refused an offer to provide him the very relief he claims the court should have granted him, Harper cannot now be heard to complain – as a ground for reversal of his convictions, which he does not dispute are supported by substantial evidence – that he was prejudiced by the court's failure to grant him a second pretrial *Marsden* hearing.

(Lodgment 8, at 18-19.)

The federal habeas question is whether the trial court's denial of, or failure to rule on, the motion "actually violated [the petitioner's] constitutional rights in that the conflict between [the petitioner] and his attorney had become so great that it resulted in a total lack of communication or other significant impediment that resulted in turn in an attorney-client relationship that fell short of that required by the Sixth Amendment." Schell, 218 F.3d at 1026. Petitioner has not shown that here. The trial court made an sufficient inquiry into whether Petitioner was receiving adequate representation from his attorney during the first Marsden motion. The record shows that Petitioner ultimately acknowledged that Epley was a "competent lawyer" despite his misgivings. (Lodgment 8, at 11.) As for Petitioner's second request for a Marsden hearing, Petitioner has no grounds to complain of being denied a second Marsden hearing because Petitioner refused the trial judge's offer for appointment of counsel, subsequently withdrew his request for appointment of new counsel, and elected to continue to represent himself in his trial. The court of appeals correctly applied harmless error analysis to Petitioner's claim that he was denied a second Marsden hearing and ultimately counsel as an impecunious defendant. See U.S. v. Gonzalez-Lopez, 548 U.S. 140, 144-46 (2006).

12cv364 BTM (PCL)

Petitioner does not cite to any other federal laws that would cause this court to find that the state court ruling was contrary to or involved an unreasonable application of existing federal law. Accordingly, Petitioner's habeas relief on this ground should be **DENIED.**

### IV. CONCLUSION

The Court submits this Report and Recommendation to United States District Judge Barry Ted Moskowitz under 28 U.S.C. § 636(b)(1) and Local Civil Rule 72.1(c)(1)(c) of the United States District Court for the Southern District of California. For the reasons outlined above, IT IS HEREBY RECOMMENDED that the Court issue an order: (1) approving and adopting this Report and Recommendation, and (2) directing that Judgment be entered **DENYING** the request for an evidentiary hearing and **DENYING** Petition for Writ of Habeas Corpus.

IT IS ORDERED that no later than **May 14, 2013**, any party to this action may file written objections with the Court and serve a copy on all parties. The document should be captioned "Objections to Report and Recommendation."

IT IS FURTHER ORDERED that any reply to the objections shall be filed with the Court and served on all parties no later than **May 24, 2013.** The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order. See Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d 1153, 1156 (9th Cir. 1991).

**IT IS SO ORDERED.**

DATED: May 3, 2013

_____
Peter C. Lewis
U.S. Magistrate Judge
United States District Court